SUSAN A. HURD *et al.* Appellees, *vs.* CHARLES H. REED *et al.* Appellants.

*Opinion filed October 28, 1913.*

1. WILLS—*it is the duty of an executrix to defend the will.* It is the duty of an executrix to defend the will when the same is attacked by heirs.

2. SAME—*term "undue" influence means "wrongful" influence.* "Undue" influence means "wrongful" influence, but influence which is secured by a child merely through the parent's affection is not wrongful unless it goes to the extent of depriving the parent of his free agency.

3. SAME—*what does not show undue influence.* Proof that the testator's son, who was one of the four principal beneficiaries of the will, sharing equally with the other three, who were his sis-

ters, accompanied the testator to the scrivener's home, sent for a stenographer, said the will must be made that day as he was going away, and stated that the testator was not going to allow his three grandchildren to share equally with the children because their mother had treated him shabbily, does not show such undue influence as avoids the will, where the testator lived for several months thereafter with the will in his possession and the son lived in a foreign State, thus giving the testator ample time to change his will if he so desired, there being no question of his mental ability to do so.

4. SAME—*undue influence must operate at time of the transaction sought to be impeached.* Undue influence such as will avoid a deed or will must go to the extent of depriving the grantor or testator of his free agency and must operate at the time of the transaction sought to be impeached.

APPEAL from the Circuit Court of Boone county; the Hon. CHARLES H. DONNELLY, Judge, presiding.

CHARLES W. FERGUSON, and P. H. O'DONNELL, for appellants.

WILLIAM L. PIERCE, and RICHARD V. CARPENTER, for appellees.

Mr. JUSTICE VICKERS delivered the opinion of the court:

Charles Reed died testate at his home in Belvidere on the 15th day of November, 1910. He was above eighty years of age at the time of his death. He left surviving him four children (Charles H. Reed, Lillian M. Ritchie, Sylvia J. Beach and Harriet A. Kimmy,) and three grandchildren, (Susan A. Hurd, Harriet Hardy and Minnie Jeter,) surviving children of George S. Reed, a son of the testator who died many years before his father. By his will the testator gave each of his grandchildren $100. His household effects were given to his three daughters above named, and all of the residue of his property, both real and personal, was devised to his four children, share and share

alike. Charles H. Reed and Bessie C. Parker were named as executors of the will, but only the last named qualified. The will was duly admitted to probate and letters testamentary issued to Bessie C. Parker. The three grandchildren above named filed a bill in the circuit court of Boone county to have the will set aside and declared null and void on the ground that its execution was procured through the undue influence of Charles H. Reed. The residuary legatees answered the bill, in which the allegations in regard to the exercise of undue influence were expressly denied. An issue at law was made up and submitted to a jury, which, upon being tried, resulted in a finding that the instrument mentioned in the pleading purporting to be the last will and testament of Charles Reed, deceased, was not his last will and testament. The court below, after overruling a motion for a new trial, granted the prayer of the residuary legatees for an appeal to this court, which has been perfected, and the record is thus brought before us for review.

The bill as originally drawn alleged the unsoundness of mind and testamentary incapacity of the testator, but this charge was stricken out by an amendment to the bill, and the only issue involved is whether the execution of the will was brought about through the undue influence of the testator's son, Charles H. Reed.

The circumstances under which the will in question was executed are as follows: Charles H. Reed resided in the State of Washington. In the winter of 1910 he came to Boone county, Illinois, to visit his father and other relatives. On the 21st day of February, 1910, the testator and his son went to the residence of William Bowley, who was then the county clerk, for the purpose of procuring Bowley to prepare a will for Charles Reed. Bowley was sick in bed at the time and unable to write the will. A young lady stenographer was called to the residence and Bowley dic-

tated the will to her, and she went away and transcribed it from her shorthand notes and added an attestation clause and returned to the Bowley residence with the typewritten copy. Bowley read the will aloud to the testator, who expressed himself as satisfied with it and thereupon signed the same, and it was attested by Bowley and Louise Lawrence, the stenographer. After the will was executed the testator took it away with him. He died the latter part of 1910.

The testimony relied upon to establish the charge of undue influence is mainly that given by the attesting witness William Bowley. This witness was called in the first instance by appellants and testified to the execution of the will under the circumstances above detailed, and stated that at the time the testator signed the document he believed him to be of disposing mind and memory. He also testified that he and Miss Lawrence signed the will as witnesses at the request of the testator, in his presence and in the presence of each other. Miss Lawrence testified to the execution of the will in the manner already stated, and corroborated Bowley as to the manner in which the will was written, the calling of herself and Bowley to witness the same, and expressed the belief that the testator was at the time of the execution of the will of sound mind and memory. Miss Lawrence did not remember that Charles H. Reed was in the room where the will was executed when she returned with the copy of the will. Bowley testified that he was present during all of the time that the testator was there. He was called again as a witness by appellees and examined very fully in respect to the occurrences and conversation that took place in his presence during the entire time that the testator and his son were in his room.

When Bowley was examined on behalf of appellees he testified that he was county clerk of Boone county and had held that position for ten years; that he had known the

testator, Charles Reed, for thirty years; that he knew him before he moved to Belvidere and when he lived on a farm near Reed's crossing, about five or six miles from Belvidere. He testified that he had a conversation with the testator in August, 1909, in which the subject of disposing of his property by will was discussed; that in this conversation Reed told the witness that he intended to make a will and dispose of his property, giving each child an equal share and an equal share to the three grandchildren; that the testator said he wanted to treat them all alike. Bowley testified that he had no further conversation with the testator until he and his son came to his room on the day the will was executed; that when the two men came into the room the testator introduced Charles H. Reed to the witness, and after a few remarks the testator said: "You know, Billy, I have had a number of talks with you with reference to my making a will, and we have come in to-day to see if you could attend to it for us;" that witness replied that he was physically unable to write the will, owing to his illness; that Charles H. Reed then said: "It has got to be done to-day; I have to go back to Washington in a few days and it must be done while I am here;" that Charles H. then suggested that a stenographer might be procured and the will dictated, and the witness then called his daughter and directed her to telephone to Miss Lawrence. After the stenographer had been sent for, the witness said to the testator, "Charley, I presume you are going to make about the same distribution of your property that you told me you were going to make that Sunday afternoon we sat near your wife's grave, in the cemetery." To this question Charles H. replied: "No, he is not; he isn't going to give the grandchildren anything." Bowley commented upon this, and said it looked strange that the testator was not going to give the grandchildren anything after having told him, in the cemetery, that he was going to give them an equal share

with the children.   Bowley testified that he asked young
Reed to retire from the room in order that he might have
a talk with the testator alone, and that he refused to com-
ply with the request but remained with his father during
the entire time.   The explanation given to Bowley why the
grandchildren were not to have a full share was that their
mother had treated the testator "shabbily."   This explana-
tion, Bowley says, was made by young Reed, whereupon
he asked the testator if that was true, and he said it was;
that he had been mistreated by the mother of the grand-
children.

The foregoing is the substance of the testimony relied
upon to establish the charge of undue influence.   On his
cross-examination Bowley's testimony was weakened to
some extent.   He admitted, on cross-examination, that he
thought the testator should have made the will in accord-
ance with the conversation had with him in August before;
that he thought the terms of the will should have been
so changed that the grandchildren would receive an equal
share with the children.   Upon being further pressed in
cross-examination the witness admitted, also, that the tes-
tator exhibited a great deal of ill-feeling toward the mother
of the grandchildren, and he also stated that he appeared
to be very much incensed when her name was mentioned,
and that the testator himself gave that as a reason for the
change he wanted to make in the will, although in his ex-
amination in chief the impression was made that it was the
younger Reed who explained the change in the testator's
mind.   The witness also stated, on cross-examination, that
after the will was written, and before it was signed, he
read it over to the testator and asked him if that was the
way he wanted his will, and that the testator told him it
was right.

The evidence is clear that the testator was in the full
possession of his mental faculties and that he thoroughly

understood the effect of what he was doing, and that the will as drawn was in accordance with his desire on the day it was made. The evidence falls short of establishing a charge of undue influence. The utmost that can be said of the proof is, that it shows that several months before the testator intended to make a somewhat different disposition of his property, but there can be no doubt, under the evidence, that on the day he made his will he disposed of his property according to his own wishes. There is no evidence that Charles H. Reed had ever discussed the subject of his father's will with him prior to the time they came to the Bowley residence, except what may be inferred from the conversation which took place at the time the will was drawn. The testator lived for several months after the will was executed and after Charles H. Reed had returned to his home in Washington, during which time he had ample opportunity to have added a codicil or made a new will had the one already made been for any reason unsatisfactory to him. The evidence leaves the impression that the witness Bowley is very much dissatisfied with the way the testator disposed of his property. His sister was appointed executrix and given power to sell the real estate, but the devisees, all being adults, agreed among themselves to divide the real estate and take their shares in the land. The executrix failed to answer the bill and has not in any way sought to defend or uphold the will of the testator, who placed confidence enough in her to name her as one of the executors of his will. It is the duty of an executor to defend the will. As was said by this court in *Pingree* v. *Jones,* 80 Ill. 177: "He owes this, at least, to the memory of the dead, who placed this confidence in him. * * * To do otherwise would be a gross dereliction of duty." Charles H. Reed denies that he exercised, or attempted to exercise, any influence over his father in connection with

the making of his will. We have stated the substance of all the testimony tending to prove the charge of 'undue influence.

The doctrine of this court as to what constitutes "undue influence" which will justify a court of equity in setting aside a will or other instrument has often been announced. In *Dowie* v. *Sutton,* 227 Ill. 183, this court, on page 197, said: "The word 'undue,' when used to qualify influence, has the legal meaning of 'wrongful.' Hence 'undue influence' means a wrongful influence. But influence secured through affection is not wrongful, and when a will is made in favor of a child at his solicitation and because of partiality influenced by affection for him it will not be undue influence,"—citing *Dickie* v. *Carter,* 42 Ill. 376; *Brownfield* v. *Brownfield,* 43 id. 147; *Meeker* v. *Meeker,* 75 id. 260; *Burt* v. *Quisenberry,* 132 id. 385. In *Francis* v. *Wilkinson,* 147 Ill. 370, and in *Wilcoxon* v. *Wilcoxon,* 165 id. 454, it was held that undue influence which will void a will or deed must go to the extent of depriving a party of his free agency and must operate at the time of the transaction sought to be impeached. See, also, *Sears* v. *Vaughan,* 230 Ill. 572.

Under the law as established by the foregoing authorities appellees have failed to establish that the will in question was the result of undue influence exercised by Charles H. Reed or any other person.

The decree of the circuit court of Boone county is reversed and the cause remanded to that court for further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*